UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WAYDE HOLLIS HARRIS, | No. 2:17-cv-0680 TLN KJN P |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| S. KERNAN, et al., | |
| Defendants. | |

I. Introduction

Plaintiff is a former state prisoner, proceeding without counsel. Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, and is proceeding in forma pauperis. Defendant M. Kuersten's motion for summary judgment is before the court.[1] As discussed below, the motion should be granted.

II. Plaintiff's Allegations

Plaintiff has myriad medical issues,[2] and received numerous medical exams and tests,

---

[1] Defendant Kuersten is the sole remaining defendant. Following screening (ECF No. 22), plaintiff consented to the dismissal of defendants Dr. Yuen, Voong, Dr. Largoza, Guillory, and Wamble on December 31, 2017 (ECF No. 24), and such defendants were dismissed without prejudice on January 10, 2018 (ECF No. 28). On January 12, 2018, defendant J. Clark Kelso was also dismissed. (ECF No. 29.)

[2] Plaintiff appended numerous medical records to his pleading, which the court summarized in

1

including some which have been repeated.  Plaintiff states he has a history of achalasia, for which he had surgery in the 1980s,[3] and multiple endoscopic dilatations since.  (ECF No. 20 at 42.)

In his verified amended complaint, plaintiff alleges that defendant Dr. Martin Kuersten failed to place a medical hold on plaintiff so that medical tests could establish a diagnosis, and plaintiff could receive proper treatment for his ongoing gastrointestinal ("GI") issues.  Moreover, plaintiff contends that Dr. Kuersten improperly denied the referral for plaintiff to receive the thoracic surgery recommended by Dr. Chambers.  Instead, Dr. Kuersten chose to send plaintiff to a radiologist.  Plaintiff claims that in the face of plaintiff's serious medical needs, which have not been properly treated for years, Dr. Kuersten's actions and failures to act constitute deliberate indifference to a significant risk to plaintiff's health.  Plaintiff also contends Dr. Chen acknowledged that plaintiff needs a "Belsey Mark IV procedure," requiring thoracic surgery repair.  (ECF No. 20 at 8.)

Plaintiff also contends he needs orthopedic surgery to re-attach the tendon in the thumb on his right hand, which Dr. Kuersten also denied.  (ECF No. 20 at 8, 19.)

III. Undisputed Facts ("UDF")[4]

1. Plaintiff was an inmate in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), and was incarcerated at California State Prison Solano ("CSP-SOL") at all times relevant to this lawsuit.

2. Defendant Dr. Martin Kuersten is the Chief Medical Executive at CSP-SOL, a position

---

the screening order.  (ECF No. 22 at 1-9.)  Plaintiff's past injuries and past operations are listed in a March 20, 2013 medical record from Pioneers Memorial Healthcare District.  (ECF No. 20 at 46-47.)  Plaintiff also has "traumatic arthritis," (ECF No. 20 at 58), and as of June, 2017, a history of diabetes, high blood pressure, COPD, and coronary artery disease was noted (ECF No. 20 at 115).

[3] On January 8, 1984, plaintiff was admitted to the hospital for severe achalasia, and the next day underwent a Heller myotomy and a hiatus hernia repair using the Belsey Mark IV technique.  (ECF No. 20 at 126.)  Achalasia is the "failure to relax; referring especially to visceral openings such as the pylorus, cardia, or any other sphincter muscle." Stedmans Medical Dictionary 5880 (2014).

[4] Defendant filed an amended statement of undisputed facts.  (ECF No. 111.)  For purposes of summary judgment, the undersigned finds the following facts are undisputed.

he has held at times material to the issues herein.

3. Plaintiff first arrived at CSP-SOL on January 30, 2014.[5]

*Plaintiff's Transfers*

4. On June 1, 2016, plaintiff was transferred to San Quentin State Prison before eventually being transferred to La Palma Correction Center in Arizona on June 21, 2016.

5. [number 5 was omitted by defendants (ECF No. 111 at 2).]

6. On October 4, 2016, plaintiff was transferred back to California and eventually housed at CSP-SOL on October 11, 2016.

7. On November 7, 2016, plaintiff was transferred from CSP-SOL to Folsom State Prison (FOL); such transfer was noted to be a permanent transfer.

8. On November 29, 2016, plaintiff was returned to CSP-SOL and remained there until his apparent release on or about September 20, 2021 (ECF No. 118).

*Medical Holds*

9. The CDCR and California Correctional Health Care Services ("CCHCS") use a Medical Classification System ("MCS") to serve as the system for considering medical factors in making patient placement decisions.[6] The MCS is used to match patients' medical needs with the capabilities of facilities and programs, and is intended to ensure all patients are assigned Medical Classification Factors that allow the matching of an inmate's medical needs to institutions or facilities to support efficient bed management. In addition, the system eliminates redundant and unnecessary forms, screenings, and evaluations, reduces or prevents inefficiencies caused by disparity between patient medical needs and facility capabilities and resources, and provides

---

[5] Plaintiff's external movements are documented in defendant's Exhibit A (ECF No. 111 at 12-17.)

[6] Undisputed facts concerning such MCS are supported by the Health Care Department Operations Manual Section 1.2.14 and appendices (ECF No. 111 at 20-39), and Health Care Transfer Section 3.1.9 (ECF No. 111 at 40-48), appended as defendant's Exhibit B. Section 3.1.9 is also appended as Exhibit C. (ECF No. 111 at 50-58.) Defendant refers to the CDCR CCHCS Health Care Department Operations Manual, Section 5.1.3 (ECF No. 111 at 3), but such document is not included in defendant's exhibits. Because the court does not rely on such document in addressing defendant's motion, the court disregards such reference.

department-wide capacity to profile the medical needs of the patient population.

10. A new medical classification chrono ("MCC") is issued whenever the patient's medical condition changes an inmate's level of care, classification factors, intensity of services, specialized services, or institutional-environmental. Whenever a patient's need for a medical level of care changes, either to higher or lower level, a new MCC is issued. (ECF No. 111 at 21 [Deft's Ex. B at 2].) The MCC is normally completed by the primary care provider, but may also be completed by chief physicians and surgeons and chief medical executives. (Id.)

11. The Health Care Placement Oversight Program ("HCPOP"), in coordination with CCHCS headquarters Utilization Management ("UM") or the mental health program, "is responsible for the endorsement of patients between health care facilities if the institution cannot provide appropriate, medically necessary health care treatment of the patient." (ECF No. 111 at 40 [Deft's Ex. B § 3.1.9(b)(E)].)

12. A Temporary Medical Hold is used when a patient requires medically necessary health care services, and it is medically prudent to provide these services at the institution where the patient is currently housed. The MCC will be "Temporary." (ECF No. 111 at 26-36 [Deft's Ex. B, Appendix 1].)

13. Examples of patients who should be reviewed for potential temporary medical holds include, but are not limited to the following:

> (A) Medical: 1. Patients scheduled for major surgery or recovering from major surgery and requiring close post-operative review by the surgical team; 2. Patients having chemotherapy or radiation therapy treatment; 3. Patients undergoing a diagnostic workup; 4. Patients being fitted for a major prosthetic, requiring temporary prostheses adjustments and frequent visits; 5. Patients awaiting major Durable Medical Equipment; 6. Patients scheduled for a specialist visit, which cannot easily be duplicated elsewhere (e.g., surgical sub-specialties such as retinal surgery, or specialized oncology surgery); 7. All urgent Requests for Services or specialty appointments; 8. Hemophiliac, Hepatitis C virus, post-transplant, or human immunodeficiency virus/acquired immune deficiency syndrome patients requiring close management of medication access and continuity; 9. Patients in the middle of a speech therapy, occupational therapy, or physical therapy regimen which would be adversely impacted by transfer.

(ECF No. 111 at 26-36 [Deft's Ex. B, Appendix 1].)

14. Dr. Kuersten did not authorize plaintiff's move from CSP-SOL, and there was no medical reason to transfer plaintiff. (ECF No. 111 at 60-61 [Deft's Ex. D, Verified Responses to Plaintiff's Requests for Interrogatories, Set One, Responses 1- 4].) The decision to transfer plaintiff out of CSP-SOL was made by custody staff. (Id., Response 14.)

*Plaintiff's Medical Care*

15. Plaintiff claims he had surgery in the 1980s as a treatment for his achalasia, and has had several endoscopic procedures since that time. In 2009, following an endoscopy, Dr. Reddy believed that plaintiff might suffer from a stricture rather than achalasia. (EX E-001-003.)[7] Dr. Reddy also noted that plaintiff's change in bowel pattern (floating stools) could indicate that plaintiff might have giardiasis or pancreatic insufficiency. (Id.) Dr. Reddy recommended testing plaintiff's stool for the Giardia antigen. (Id.)

16. Following bowel prep for plaintiff's colonoscopy, plaintiff was sent to the emergency room due to abdominal cramping. (EX E-004.) The colonoscopy report showed plaintiff's terminal ileum, cecum, ascending, transverse, and left colon were all normal. (EX E-005.) It was recommended that plaintiff receive follow up in telemedicine. (Id.)

17. On October 19, 2013, while housed at Centinella State Prison, plaintiff had a telemedicine consultation with Dr. Shpaner at Alvarado Hospital in San Diego. (EX E-031-032.) Dr. Shpaner noted that plaintiff's upper GI series for small bowel showed "an entirely normal study." (Id.) Dr. Shpaner recommended a sitz marker study and an investigative laparoscopy. (Id.)

18. Plaintiff's sitz marker study indicated that plaintiff had no small or large bowel distention or abnormal calcification. (EX E-038.) The markers in plaintiff's cecum and transverse colon, showed an incomplete evacuation of all of the sitz markers indicating that his colonic transit was slow. (EX E-039-040.)

19. On July 22, 2014, plaintiff was again seen by Dr. Shpaner, who noted plaintiff's

---

[7] Medical records submitted by defendant are appended as Exhibit E. (ECF No. 111 at 70.) Because the records are Bates stamped, the court refers to such numbers for ease of reference (for example, EX-E-001). All references to EX-E numbers are to defendant's exhibit E.

"excruciating long-standing abdominal pain and constipation which he now had for the past 3 years." (EX E-041-042.)

20. Even though plaintiff was seen by multiple gastroenterologists, there was no unifying diagnosis. (EX E-001-043.) Plaintiff had received MRI's, CT scans, endoscopies, a colonoscopy, a gastric emptying study, and a sitz marker study. (Id.)

21. On July 22, 2014, Dr. Shpaner found that plaintiff's case is "quite complicated" because his complaints did not fit any pattern of unified diagnosis. Dr. Shpaner recommended that plaintiff be evaluated by a surgeon to consider diagnostic laparoscopy or therapeutic colectomy. (EX E-042.)

22. On October 21, 2015, plaintiff was seen by Dr. Ierokomos, who recommended either a GI or general surgery to evaluate plaintiff's abdominal pain. (EX E-048-049.)

23. On January 4, 2016, Dr. Chen requested that plaintiff be referred to a surgeon for diagnostic procedure/consultation. (EX E-050.) N. Largoza, M.D., approved the request on January 8, 2016. (Id.)

24. On February 8, 2016, Dr. Chen sought a thoracic surgery consult based on Dr. Chambers' recommendation. (EX E-052.) On February 10, 2016, Dr. Kuersten denied that request, noting "GI, not thoracic (no subset.)" (EX E-052.) The IUMC denied the request on March 8, 2016; "clinically stable; no medical indication." (EX E-052.)

25. Shortly thereafter plaintiff was transferred out of state to Arizona, where he continued to be seen by doctors for his complaints of abdominal pain, dysphagia, and constipation. (EX E-056-58.) Dr. Kazi recommended a colonoscopy to rule out malignancy. (EX E-057.)

26. Dr. Kazi, opined that plaintiff might have either gastroparesis after the achalasia surgery, or it could be scar tissue. (Id.)

27. On September 20, 2016, while plaintiff was in Arizona, Dr. Dos Santos performed an Esophagogastroduodenoscopy ("EGD") noting that plaintiff had "no stricture in the esophagus, and moderate patchy erythema with edematous mucosa of the antrum, with biopsies obtained." (EX E-060-062.) Dr. Dos Santos' impressions were: (1) gastritis; (2) esophageal tertiary contraction; and (3) normal duodenum. The plan was to continue plaintiff on Prilosec and

schedule plaintiff for a "24-hour pH monitoring and esophageal manometry, and special colonoscopy preparation." (Id.)

28. Plaintiff was transferred back to California before the tests recommended by Dr. Dos Santos could be completed. (ECF No. 111 at 14-15 [Deft's Ex. A at 3-4.])

29. On December 13, 2016, Dr. Chen requested a thoracic surgery evaluation for plaintiff's "chronic left upper quadrant pain, noting that Dr. Chambers had ruled out plaintiff's ventral hernia as the cause of plaintiff's pain." (EX E-183.) Dr. Chen noted that multiple GI specialists, CSP/EGD, CT scan could not find the cause of pain. (Id.)

30. On December 15, 2016, Dr. Kuersten denied the request, noting: "Lacks title 15 medical necessity, had CSP/EGD and CT, plaintiff's weight is stable, no functional impairment." (EX E-181.)

31. On June 1, 2017, plaintiff was sent to San Joaquin General Hospital for a consultation regarding his abdominal pain, loose stool, difficulty swallowing, and difficulty with colonoscopy testing. (EX E-075-077.)

32. Dr. Bi noted plaintiff's past thoracic surgery for achalasia, and that plaintiff's symptoms were "very vague." (EX E-075-077.) Dr. Bi suspected that plaintiff's symptoms were functional, and recommended non-invasive studies to validate plaintiff's complaints. (Id.) The recommendations of Dr. Bi included a barium swallow to evaluate any esophageal narrowing or functional dysphagia, a barium enema to look for any colonic abnormalities, that plaintiff receive a high fiber diet, a supplement of Metamucil powder, and an upper GI in four to five months. (Id.) Plaintiff was also told to chew his food well before swallowing. (Id.)

33. On July 3, 2017, a barium swallow was completed and compared to the same test from September 20, 2015. (EX E-084-085.) The test showed a new small anterior defect of the cervical esophagus at the level of C4-C5, which could represent a new esophageal web, and which could explain plaintiff's difficulty swallowing. (Id.) There was no evidence of a filling defect in the remainder of the esophagus, and both the mucosal pattern and thoracic esophagus were normal. There was no evidence of a hiatal hernia, achalasia, stricture, or ulceration. (Id.)

34. The barium enema results were compared to the CT scan of plaintiff's abdomen and

pelvis that was completed in May 2016. The findings were normal. (EX E-084.)

35. On August 3, 2017, after the barium swallow and barium enema had been completed, plaintiff was seen by Dr. Bi for a follow-up appointment. (EX E-213-216.) Dr. Bi's assessment states:

> [t]his is a 51-year-old inmate here for main concerns today of left upper quadrant abdominal pain and difficulty with bowel movements. Patient repeatedly told me that his main concern today is that he has very small bowel movements infrequently, and he has not had a good bowel movement for the past 4 years. His barium enema is normal, although patient believes otherwise. He has had multiple CT scans of the abdomen and pelvis, which have not shown any abnormalities. His Sitz marker study in 2014 did show delayed transit, and therefore I suspect patient may just have idiopathic constipation; however, patient denies that he has constipation. Patient insists on having a referral to thoracic surgery, which I do not understand, and I asked him to discuss that with his regular physician. Patient was very frustrated that I could not help him with his symptoms like he requested, and I apologized.

(EX E-214-215.) Dr. Bi recommended that plaintiff possibly get a second opinion for his multiple GI complaints at an academic medical center, such as UC Davis or UCSF, anti-constipation medication such as Linzess, a high-fiber diet with a daily fiber supplement, and over-the-counter laxatives. (EX E-215.) Because the barium tests were normal, the upper GI test was deemed unnecessary. (EX E-213-216.)

36. On October 31, 2017, Dr. Carrick authored a memo from the CCHCS Headquarters Utilization Management Committee that reviewed the request for plaintiff to receive an anorectal/colonic motility study. (EX E-217.) The Committee denied the request, finding that it was not necessary for the protection of plaintiff's life, or pose a risk to life, or to what extent activities of daily living would be facilitated or impaired by the proposed service. (Id.) The Committee found that the proposed procedure did not prevent premature death, prevent severe illness, or alleviate severe pain. (Id.)

37. On May 7, 2018, Dr. Chen, charted that plaintiff "has had EGD, CSP, Barium studies, CT scan -- all were negative. Multiple GI specialists were consulted and unable to find the etiology of his symptoms." (EX E-206.) Dr. Chen added, "when asked detail regarding [plaintiff's] symptoms, he was unable to describe his symptoms specifically, unable to provide

the duration and he declined to answer." (Id.)

37a. On July 24, 2020, plaintiff was provided an imaging exam "FL Small Bowel w Serial Film." (ECF No. 116 at 395.) The impression was "[e]xtremely delayed small bowel transit without evidence of structural obstruction." (Id.)

*Plaintiff's Thumb Injury*

38. Plaintiff reported that he injured his thumb on March 15, 2017. (EX E-177.)

39. Plaintiff was seen by Dr. Chen on April 10, 2017. (EX E-177.) Plaintiff claimed that the injury to his thumb had not improved, and an x-ray showed slight widening of ulnar aspect of joint space. Plaintiff was given a thumb spica/wrist splint. (EX E-177.) Following the examination, Dr. Chen requested that plaintiff be referred for orthopedic/hand surgery to repair plaintiff's right thumb base pain -- ligamentous laxity. (EX E-177.)

40. On April 11, 2017, Dr. Kuersten denied the request for surgery noting "medical management incomplete," and the documentation was inadequate to support a need for surgical intervention. (EX E-176.) Dr. Kuersten also noted that plaintiff had a history of extensive prior trauma to his right hand and thumb, and that plaintiff should first be considered for physical therapy. (Id.)

41. On June 13, 2017, plaintiff's right thumb was examined by Dr. Weiss at Weiss Orthopedics. (EX E-078-079.) Dr. Weiss, who reviewed the March 16, 2017 x-rays, noted there was a "nondisplaced transverse fracture through the base of the distal phalanx, gross incompetence of the ulnar collateral ligament with approximately 60 degrees of angulation, minimal degenerative changes, and previous thumb and small finger metacarpal fractures that have healed." (Id.) Plaintiff complained that his thumb "doesn't work;" that he could not grip, squeeze, pinch or bend the thumb; when he tries, the thumb "slips." (Id.) Upon an examination by Dr. Weiss, plaintiff's right thumb "reveal[ed] an obvious radial deformity at the metacarpophalangeal joint," and "gross incompetence of the ulnar collateral ligament." (Id.) While the fracture of the thumb had already healed, Dr. Weiss diagnosed plaintiff with "chronic ulnar collateral ligament insufficiency, right thumb metacarpophalangeal joint (gamekeeper's thumb)," which could be corrected with surgery. (Id.) Dr. Weiss noted that plaintiff "has a lot of

functional difficulties with his thumb." (Id.)

42. On June 15, 2017, Dr. Khin Win requested that plaintiff be scheduled for the surgery recommended by Dr. Weiss. (EX E-166.) Dr. Kuersten denied the request, noting that there was insufficient clinical information (PCP progress notes, P.T. eval. of 4/25/17, and ortho report on RTS of 6/13/17 all lacked clinical detail/examination/documentation of objective functional impairment.) (EX E-166.)

43. Following Dr. Weiss' recommendation, medical records show:

- on March 6, 2018, Dr. Chen charted that plaintiff has normal ADL (activities of daily living); per RN Morin's February 28, 2018 visit note, she saw plaintiff playing handball yesterday; A-yard custody officer reported he sees plaintiff, the best handball player in the yard, playing handball all the time (EX E-207);
- on May 7, 2018, Dr. Chen charted that plaintiff has normal ADL, plays handball daily (per custody officer, plaintiff is the best player in A-yard), the RN also saw plaintiff playing handball and witnesses him "doing insanity exercises work out in Gym" (EX E-206);
- on May 23, 2018, Dr. Chen charted that plaintiff has normal ADL, plays handball, and does an "insanity exercise in the gym" (as witnessed by the RN, of which plaintiff was aware) (EX E-205);
- on June 29, 2018, RN Morin observed plaintiff throwing a baseball or softball with his right hand in the yard with other inmates, throwing ball with strong right arm and catching ball securely with strong left arm (EX E-202); on multiple occasions another A clinic nurse and correctional officer observed plaintiff playing handball with skill and ease for at least 20 minutes (EX E-202);
- on July 13, 2018, for over 25 minutes, RN Morin observed plaintiff performing vigorous training type exercise; jumping from standing position to push up position and doing alternating single-handed push-ups in repetition; plaintiff was later seen throwing and hitting a small blue handball against the concrete wall while holding a capped water bottle in the other hand (EX E-201);

- on August 15, 2018, for over ten minutes in the gym, RN Morin observed plaintiff performing multiple full body push-ups and repetitive boxing-type poses/strikes (EX E-201); and

- on September 11, 2018, plaintiff reported to Dr. Chen that plaintiff might have injured his foot from exercise, claimed he is the best handball player in the yard, has normal ADL and participates in gym exercise program, and works in yard crew. (EX E-204).

44. In addition, plaintiff was able to work on the yard crew without difficulty for several years. (ECF No. 111 at 18 [Deft's Ex. A at 7].)

IV. Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure 56 is met. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[8]

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).) "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot

---

[8] Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010. However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

11

produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R.

Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

By notice filed April 30, 2021 (ECF No. 109-1), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

V. Legal Standard for Eighth Amendment Claim

The Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). To state a claim a plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing Jett, 439 F.3d at 1096). "Deliberate indifference is a high legal standard," Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Snow, 681 F.3d at 985 (citation and quotation marks omitted).

"Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)).

Further, "[a] difference of opinion between a physician and the prisoner -- or between medical professionals -- concerning what medical care is appropriate does not amount to deliberate indifference." Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)). Rather, a plaintiff is required to show that the course of treatment selected was "medically unacceptable under the circumstances" and that the defendant "chose this course in conscious disregard of an excessive risk to plaintiff's health." Snow, 681 F.3d at 988 (quoting Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996)). In other words, so long as a defendant decides on a medically acceptable course of treatment, his actions will not be considered deliberately indifferent even if an alternative course of treatment was available. Id.

## VI. Discussion

Initially, plaintiff seeks dismissal of defendant's motion based on alleged discrepancies in the exhibits submitted by defendant in support of the motion, arguing they were mislabeled, incomplete, and used previously filed documents as part of Exhibit E. But plaintiff fails to explain how such discrepancies preclude summary judgment; that is, how such discrepancies demonstrate there is a material dispute of fact. Plaintiff does not argue that he was confused by the alleged mislabeling of the exhibits in defendant's briefing. Also, as argued by defendant, the defendant produced only that portion of plaintiff's movement history that was relevant to the allegations against Dr. Kuersten in plaintiff's amended complaint. Plaintiff does not contend that any of the submitted exhibits are not valid or were not authenticated. Therefore, plaintiff's objections are overruled.

Second, plaintiff appends a copy of defendant's briefing with his handwritten notations, including question marks and a few comments, but offers no substantive argument in opposition to the motion. The only new evidence submitted was his Exhibit C, a Queen of the Valley Imaging Services Report dated July 24, 2020, which noted an "[e]xtremely delayed small bowel transit without evidence of structural obstruction." (ECF No. 116 at 395.) But plaintiff fails to

1  explain how such exhibit rebuts defendant's evidence or demonstrates defendant's deliberate
2  indifference.  In addition, plaintiff highlighted the report's notation that the film also
3  demonstrated "postsurgical changes of laminectomy and fusion at L4-5."  (ECF No. 116 at 395.)
4  However, plaintiff's pleading did not include allegations concerning his spine or back.

As argued by defendant, plaintiff's unsupported allegations in his opposition are not sufficient to demonstrate a genuine dispute of fact precludes summary judgment.  See Anderson, 477 U.S. at 248.

### Plaintiff's Transfers

In his verified pleading, plaintiff contends that his lack of adequate medical care was a result of his multiple transfers, and that Dr. Kuersten knew or should have known about all the unnecessary transfers.  (ECF No. 20 at 21.)  Dr. Kuersten adduced evidence that he is not responsible for housing or transfer decisions at CSP-SOL.  (UDF 9-11, 14.)  Plaintiff's transfer to Arizona was not based on plaintiff's medical status as there were no changes to plaintiff's MCC; rather, his transfer was made by custody staff.  (UDF 14.)  Further, Dr. Kuersten found no medical need to keep plaintiff at CSP-SOL.  (UDF 14.)

Plaintiff adduced no evidence in rebuttal, and failed to demonstrate that he should have received a medical hold to avoid such transfers.  (UDF 12-13.)  Indeed, the record reflects that plaintiff received medical treatment while housed in Arizona.  In any event, plaintiff adduced no evidence that Dr. Kuersten was responsible for any of plaintiff's transfers, or for allegedly lowering plaintiff's medical risk status so plaintiff could be transferred.

### Plaintiff's Gastrointestinal Issues

Here, the undisputed medical evidence demonstrates that despite multiple specialists' inability to provide a proper diagnosis, plaintiff received extensive medical care in an attempt to diagnose his complaints of left upper quadrant pain.  While plaintiff contends that multiple transfers deprived his treating physicians of an opportunity to provide a proper diagnosis, the record reflects conflicting diagnoses as well as an inability to diagnose plaintiff's medical complaints.  In 2014, Dr. Shpaner referred to plaintiff's case as "quite complicated."  (UDF 21.)  Plaintiff does not provide competent evidence demonstrating that such transfers prevented a

proper diagnosis rather than his complex medical history or condition. Indeed, despite being housed at CSP-SOL since November 29, 2016, medical professionals were unable to provide a definitive diagnosis.

Further, while plaintiff contends that Dr. Kuersten was deliberately indifferent to plaintiff's serious medical needs by denying Dr. Chen's request to refer plaintiff for a consult with a thoracic surgeon,[9] the medical evidence shows that Dr. Kuersten determined that such referral was not medically necessary, based on the opinion of Dr. Bi. Although Dr. Chen believed such referral was necessary, Dr. Bi and Dr. Kuersten did not. Indeed, Dr. Bi suspected plaintiff suffered from idiopathic constipation. (UDF 35.) Thus, the undisputed evidence reflects a difference of opinion among the doctors as to whether a referral to a thoracic surgeon was appropriate. Snow, 681 F.3d at 987 ("[a] difference of opinion between . . . medical professionals [ ] concerning what medical care is appropriate does not amount to deliberate indifference.")

Such difference of opinion is further supported by medical records from Arizona. Plaintiff was treated for his complaints of abdominal pain, dysphagia, and constipation, and it appears Dr. Kazi agreed with Dr. Kuersten's view that plaintiff's issues were gastrointestinal, not thoracic, because Dr. Kazi recommended a colonoscopy, and then opined plaintiff may have either gastroparesis,[10] or it could be scar tissue. (UDF 26.) On the other hand, Dr. Dos Santos, also in Arizona, performed an EGD, noting no stricture in the esophagus, and charting the following impressions: (1) gastritis;[11] (2) esophageal tertiary contraction; and (3) normal duodenum. (UDF 27.)

Plaintiff adduced no evidence to demonstrate that Dr. Kuersten's denial of the referral was based on anything other than a difference of opinion among medical doctors. In addition,

---

[9] In his verified pleading, plaintiff stated that Dr. Chen acknowledged that plaintiff needs a "Belsey Mark IV procedure," requiring thoracic surgery repair. (ECF No. 20 at 8.) However, plaintiff points to no medical record reflecting such statement by Dr. Chen.

[10] Gastroparesis is the "[w]eakness of gastric peristalsis, which results in delayed emptying of the bowels." Stedmans Medical Dictionary 364690 (2014).

[11] Gastritis is "[i]nflammation, especially mucosal, of the stomach." Stedmans Medical Dictionary 363830 (2014).

plaintiff was provided less invasive treatment options and additional tests, including another CT scan of his abdomen and pelvis. (UDF 30-37.) Plaintiff failed to rebut such evidence. The record makes clear that plaintiff disagrees with the findings of both Dr. Bi and Dr. Kuersten. But plaintiff fails to demonstrate that Dr. Kuersten's actions were medically unacceptable under the circumstances. See Toguchi, 391 F.3d at 1060. Accordingly, defendant is entitled to summary judgment concerning plaintiff's gastrointestinal issues.

Plaintiff's Thumb Injury

The treatment for plaintiff's thumb poses a closer question. First, plaintiff was provided a definitive diagnosis by a specialist, hand surgeon Dr. Weiss, who diagnosed plaintiff with gamekeeper's thumb, the chronic ulnar collateral ligament insufficient at the right thumb metacarpophalangeal joint. Both Dr. Chen and Dr. Win recommended that plaintiff be scheduled for the surgery based on Dr. Weiss' recommendation.

In his first denial, prior to Dr. Weiss' consult, Dr. Kuersten found that the medical management was incomplete and the documentation was inadequate to support a need for surgical intervention, and noted plaintiff's history of extensive prior trauma to his right hand and thumb, finding plaintiff should first be considered for physical therapy. (UDF 40.) In his second denial, Dr. Kuersten found that there was "insufficient clinical information (PCP progress notes, P.E. eval. of 4/25/17, and ortho report on RTS of 6/13/17, and that all medical records lacked sufficient clinical detail/ examination documents of objective functional impairment). (UDF 42.)

However, Dr. Weiss examined plaintiff and noted he had a "lot of functional difficulties with his thumb." (UDF 41.) Dr. Kuersten does not declare that such gross incompetence could be treated by physical therapy. Indeed, Dr. Weiss did not mention physical therapy as an alternative treatment plan. Rather, Dr. Weiss stated that "[f]urther nonoperative treatment including casting, splinting, etc. will not be effective." (EX E-079.) That said, Dr. Kuersten sought further objective medical evidence of plaintiff's functional impairment. The need for such further objective evidence is supported by defendant's evidence that following Dr. Weiss' recommendation, and after plaintiff reported his thumb doesn't work, plaintiff regularly played handball, claiming he was the best handball player on the yard, has normal activities of daily

living, and participated in vigorous exercise, including push-ups and boxing-type strikes. (UDF 43.) Plaintiff was also able to work on the yard crew since January 10, 2017. (UDF 44.)

In his opposition, plaintiff does not deny his prowess at playing handball, his ability to exercise, carry on his activities of daily living, and perform his job duties as a yard worker, or otherwise address any limitations he experienced due to Dr. Kuersten's denial of surgery for plaintiff's thumb. Plaintiff points to no medical records demonstrating he presented to medical with complaints concerning limitations or pain caused by the thumb injury following Dr. Weiss' recommendation. Similarly, in his verified amended complaint, plaintiff did not set forth how the lack of surgery caused plaintiff further injury or limited his activities, and failed to specifically address how the denial of surgery for his thumb demonstrated Dr. Kuersten's deliberate indifference. (ECF No. 20 at 18-19.)

Rather, plaintiff claimed that medical and custody staff told plaintiff that he "ain't getting fixed up here Mr. Harris, Dr. Kuersten has the big state of California Lawyers behind him and he don't care." (ECF No. 20 at 19.) Dr. Kuersten declares that he "has no recollection of having ever made such a statement." (ECF No. 111 at 64.) Plaintiff does not declare that Dr. Kuersten made such statement to plaintiff. Because the alleged statement is not within plaintiff's personal knowledge, it is not admissible into evidence and cannot be considered. See Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (*en banc*) ("A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence.").

Therefore, the undersigned finds that plaintiff fails to demonstrate a material dispute of fact exists as to whether Dr. Kuersten acted with a culpable state of mind in connection with the denial of the recommendation for surgery on plaintiff's thumb. Absent evidence not presented here, the undersigned cannot find that Dr. Kuersten was deliberately indifferent to plaintiff's serious medical needs in connection with his need for surgery for his thumb injury.

Qualified Immunity

In light of the above findings, the undersigned declines to address defendant's alternative argument.

<u>Injunctive Relief</u>

As noted above, plaintiff has now been released from state custody. Therefore, his request for injunctive relief (ECF No. 20 at 22) is moot. See <u>Preiser v. Newkirk</u>, 422 U.S. 395, 402-03 (1975) (when inmate is released from custody, any claim for injunctive relief becomes moot).

## VII. Recommendations

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendant's motion for summary judgment (ECF No. 109) be granted; and

2. This action be terminated.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **twenty-one** days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: November 18, 2021

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/harr0680.msj.med